**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

| | |
|---|---|
| **ROBERT WILEY SIBURT,** | |
| **Plaintiff,** | |
| v. | **CIVIL ACTION NO.: 5:17-CV-113 (JUDGE STAMP)** |
| **NANCY A. BERRYHILL, Deputy Commissioner of Social Security,** | |
| **Defendant.** | |

**REPORT AND RECOMMENDATION**

**I.    INTRODUCTION**

On July 24, 2017, Plaintiff Robert Wiley Siburt ("Plaintiff"), by counsel Christopher M. Turak, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Deputy Commissioner of Social Security[1] ("Deputy Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).  On September 27, 2017, the Deputy Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings.  (Answer, ECF No. 6; Admin. R., ECF No. 7). On October 27, 2017, and November 27, 2017, Plaintiff and the Deputy Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12).  Following

---

[1] According to the Government Accountability Office, as of November 17, 2017, Nancy Berryhill had no authority to act in her position as Acting Commissioner of Social Security because her appointment violated the Federal Vacancies Reform Act. As such, Ms. Berryhill will continue in her capacity as Deputy Commissioner of Operations.

review of the motions by the parties and the Administrative Record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.    <u>PROCEDURAL HISTORY</u>

On June 27, 2013, Plaintiff protectively filed his first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on May 31, 2013. (R. 22). Plaintiff's earnings record shows that he acquired sufficient quarters of coverage to remain insured through December 17, 2017; therefore, Plaintiff must establish disability on or before this date. (R. 22). This claim was initially denied on October 15, 2013 (R. 22) and denied again upon reconsideration on January 27, 2014 (R. 22). On March 21, 2014, Plaintiff filed a written request for a hearing (R. 22), which was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol on December 3, 2015 in Morgantown, West Virginia. (R. 22). Plaintiff represented by Counsel, Shannon Bateson, Esq., appeared and testified, as did Dr. Larry Ostrowski, an impartial vocational expert. Id. On March 1, 2016, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 19). On May 20, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Deputy Commissioner. (R. 6-8).

## III.    <u>BACKGROUND</u>

### A.    **Personal History**

Plaintiff was born on December 21, 1964, and was 48 years old at the time he filed his first SSI claim. (R. 46). He completed high school. (R. 47). Plaintiff's prior work experience included working as a shuttle car operator at Meigs Mine Service, a drill operator and roof bolter

at Frontier-Kemper Constructors, shift supervisor at Strata Mine Services, a buggy operator and drill operator for Emerald Coal, a tree trimmer for a power company, crew leader for GMS Mine Repair and Maintenance, and an attack helicopter repairman in the Army, he also did demolition for a steel company. (R53-55). He was not married at the time that he filed his initial claim nor at the time of the administrative hearing (R. 189, 47). He has two dependent children.[2] (R. 189). Plaintiff alleges disability based on his lower back and sciatic nerve in his right hip. (79). Plaintiff also testified that he served one year in prison, July 2, 2014 to July 22, 2015, after being convicted of a felony DUI—his second DUI. (R. 59).[3] He was also required to attend court-ordered alcohol rehab in 2013 and currently attends Alcoholics Anonymous meetings on Sundays and Mondays. Id. Prior to the ALJ hearing, Plaintiff had been hospitalized following a suicide attempt. Id. He had been referred to the Veterans Administration ("VA"), who prescribed Plaintiff with "Deloxine"[4] and has been receiving counseling from a psychologist and psychiatrist through the VA. Id.

## B.   Medical History

### 1.   Medical History Pre-Dating Alleged Onset Date of  May 31, 2013

On June 18, 2012, Doctor Char Kalpana diagnosed the Plaintiff with Depressive Disorder, Anxiety State, Alcohol Dependency, and Esophageal Reflux. (R. 532). On June 12, 2012, Gregory Wood, D.O., diagnosed Plaintiff in a surgical pathology with "Grade B Erosive Esophagitis." (R. 431). On July 23, 2012, the patient visited Wood Health Care Clinic complaining of anxiety, where primary care physician, Robert Potts PA-C, assessed the Plaintiff for Anxiety/Depression and prescribed 40 mg of Celexa Tablets and 0.5 mg of Xanax Tablets.

---

[2] One of Plaintiff's children died when he was two years old in 2014.

[3] It should be noted that Plaintiff was charged with domestic violence against his ex-wife during their marriage. (R. 362). At one point, in 2013, Plaintiff was charged with domestic assault against a State Trooper. At this point, the outcome of those charges is unknown. Id.

[4] The undersigned believes this medication to actually be duloxetine but was recorded phonetically.

3

(R. 397). A few days later, on July 27, 2012, the Plaintiff visited the office complaining of left foot pain and swollen, warm, and stiff joints. (R. 398). There, primary care physician, Duane Bartsche PA-C, administered a Celestone 6mg/Kenalog 40mg injection and prescribed and 50mg Indomethacin Capsules. Id.

On August 20, 2012, the Plaintiff visited Wood Health Care Clinic complaining of moderate and severe lower back pain. (R. 413). The pain was on both sides without radiation to either leg or buttocks. Id. The Plaintiff had full ROM, painful ROM, and was painful to palpate both sides.  The Plaintiff's right and left leg strength was the same at + 5/5. Id.  Gregory Wood, D.O., assessed the Plaintiff as having a "Strain Sprain Lumbar Spine." (R. 414). Dr. Wood administered a  Celestone  6mg/Kenalog  40mg  injection  and  prescribed  500  mg  Naprosyn Tablets. Id. The  Plaintiff  was  also  advised  to  avoid  heavy  lifting,  bending,  twisting,  and unexpected movements. Id.

On September 25, 2012, the Plaintiff visited Wood Health Care Clinic complaining of anxiety because he had stopped his medication—for which he was prescribed on July 23—two months ago. (R. 402). The Plaintiff had stopped his medication because "he thought he did not need them." Id. However, the Plaintiff started experiencing frequent agitation and aggravation, fatigue, lack of sleep, anxiety, and nervousness. Dr. Wood assessed the Plaintiff as having Depression and Anxiety, prescribing 0.5mg Xanax Tablets. (R. 403). The Plaintiff was also advised to exercise, reduce stress, avoid alcohol consumption, and return in one month or before if any problems arise. Id.

On September 29, 2012, the Plaintiff returned to Wood Health Care Clinic complaining of anxiety and depression. (R. 404). Shortly after Plaintiff's September 25, 2012 visit, Plaintiff began experiencing panic attacks which prevented him from going to work. Id. Accordingly, the

Plaintiff desired to receive a work excuse slip from the Doctor. Id. Primary care physician, Kelly Truex PA-C, assessed the Plaintiff as having anxiety and issued an excuse slip authorizing the Plaintiff to begin working again on October 1, 2012. (R. 405).

On November 1, 2012, the Plaintiff visited Wood Health Care Clinic complaining of fatigue, generally not feeling well and suffered from light headedness. (R. 406). Diagnostics completed that same day revealed anemia. Id. The doctor assessed the Plaintiff as having Anemia and Fatigue, prescribing 1mg/10ml of Carafate Suspension. (R. 408). The Plaintiff was also advised to go to the emergency room if chest pain or worsening occurred. Id.

On November 8, 2012, the Plaintiff visited Wood Health Care Clinic for a follow up on his anxiety and low iron. (R. 410). Diagnostics completed in house that same day revealed low Hemaglobin, hematocrit for the Plaintiff. Id. The doctor assessed the Plaintiff as having Anemia, Anxiety, and Fatigue, prescribing 0.5 mg Xanax Tablets. (R. 411). Plaintiff was also advised to exercise, avoid alcohol consumption, reduce stress, and continue the Carafate. (R. 412).

On November 26, 2012, the Plaintiff visited Wood Health Care Clinic complaining of anxiety and no energy. (R. 413). The Plaintiff expressed being, nervous, irritable, tired all the time, not wanting to do anything, and uninterested in the things he usually liked to do. Id. The Plaintiff denied having both homicidal and suicidal ideations. Id. The doctor assessed the Plaintiff as having Anxiety and Depression prescribing 15mg Buspar Tablets. (R. 414). The Plaintiff was also advised to return in one month or before any problems arise. Id.

On January 28, 2013, Plaintiff visited Wood Health Care Clinic complaining of sinus drainage, diarrhea, muscle aches and pains. (R. 394). The Plaintiff's symptoms had been going on for three days, and over-the-counter drugs failed to abate the symptoms. Id.  The doctor assessed the Plaintiff as having Sinusitis and Acute Bronchitis, prescribing 875/125 mg

Augmentin Tablets. Plaintiff was further advised to follow up in one week if symptoms persisted or worsened. (R. 395).

On February 6, 2013, the Plaintiff visited Wood Health Care Clinic complaining of rectal bleeding. (R. 392). Plaintiff also advised that he had experienced a two weeks history of intermittent abdominal discomfort and lower back pain on the right. Id. Further, Plaintiff had experience blood on his toilet tissue and blood in his toilet. Id. Dr. Wood assessed the Plaintiff as having Rectal Bleeding and advised the Plaintiff to return in one to two weeks or before if any problems arise. (R. 393).

On February 14, 2013, the Plaintiff visited Wood Health Care Clinic needing prescription refills for his anxiety and depression. (R. 389). The doctor noted that Plaintiff was "feeling better, not as anxious, sleeping better, not as tearful, feeling more like himself, tolerating the medication." Id. Furthermore, the doctor noted that Plaintiff denied "being tired all the time, not sleeping well, anxiety, nervousness, crying over little things, not wanting to do anything, lost interest in the things he liked to do, medication not helping, homicidal ideation, suicidal ideation, audio hallucinations, visual hallucinations, has a plan." Id. The doctor assessed the Plaintiff as having Anemia, Anxiety/Depression, and Rectal Bleeding, prescribing 0.5 mg Xanax Tablets and 40 mg Celexa Tablets.

On February 17, 2013, Melvin Saludes, M.D., conducted a CT Angiography on Plaintiff's chest. (R. 444). The CT Angiography was ordered because of Plaintiff's history with Hemoptysis and pulmonary embolus. Dr. Saludes' impression states:

1. No Pulmonary Embolus identified
2. Bilateral bnfiltrates, worse on the left
3. Significant fluid distension of the esophagus which may be related to the presence of a sliding hiatal hernia. A partial obstruction of the Distal Esophagus cannot be ruled out. The findings could also represent Achalsia.

Id.

On February 19, 2013, Zaveen Kureishy, M.D., issued a report related to an MRI conducted on Plaintiff's brain. (R. 442). The MRI was ordered because of the Plaintiff had been experiencing right arm weakness and blurred vision the last three days. Id. Dr. Kureishy's impression states:

> Multiple areas of abnormal signal in the left cerebral hemisphere in the middle cerebral artery distribution as well as a larger area of abnormal signal in the head and body of the left caudate nucleus, anterior limb of the left internal capsule and anterior aspect of the left basal ganglia, all consistent with acute or recent ischemic changes.

Id.

On February 20, 2013, Dr. Melvin ordered a post-bronchoscopy to rule out the possibility of pneumothorax. (R. 441). Dr. Melvin's impression states:

> There is no pneumothorax following bronchoscopy. There was some increased density in both upper lobes. There may be a patchy density in the left lower lobe. The lower lung fields are relatively clear. Since the examination from 2/16/13, the lower lung fields are better aerated and show less infiltrate than previously. There has been some increase in the density in or overlying the right upper lobe compared to the previous examination.

Id.

On February 22, 2013, the Plaintiff visited Wood Health Care Clinic after being hospitalized with pneumoniae a week prior. (R. 386). The doctor noted Plaintiff was "breathing better and is fatigued," and that Plaintiff was taking medicine "per Dr. Saludes." Id. Plaintiff was also sent to receive a work excuse slip. Id. The doctor assessed the Plaintiff as having Anemia and Pneumonia, instructing Plaintiff to ingest 600mg Mucinex every twelve hours to thin out phlegm. (R. 387-8). The doctor also advised Plaintiff to continue as per Dr. Saludes instructions,

and to see him in a week. A work excuse slip was issued, and the Plaintiff was instructed to return in one to two weeks or before if any problems arise. Id.

On March 20, 2013, the Plaintiff visited Wood Health Care Clinic complaining of abdomen cramps, cephalgia, and sinus drainage. (R. 383). The doctor noted Plaintiff was in the hospital a month ago due to pneumonia. The doctor further noted that Plaintiff was "on Levaquin in the hospital and then discharged on Amoxil." Id. The doctor assessed the Plaintiff as having Sinusitis, GERD, and Anemia Iron Deficiency. (R. 384).   The Plaintiff was injected with Decadron 4mg and Kenalog 40mg and underwent a Strept Screen, LAB Influenza swab, and a CBC. (R. 385).

### 2.  Medical History Post-Dating Alleged Onset Date of May 31, 2013

On June 3, 2013, the Plaintiff was seen in the Ohio Valley Medical Center ER for hip, leg, and back pain—rated at a ten out of ten by the Plaintiff. (R. 287). The Plaintiff, when questioned about the origin of the pain, denied knowing of any injury. Id. The attending physician, Christopher Gooch, D.O., noted that the Plaintiff had a "history of back issues." Id. On physical examination, Dr. Gooch noted the Plaintiff had "lumbosacral tenderness on the right greater than left. He has muscle spasm of the right psoas muscle. I cannot appreciate any obvious midline bony tenderness." (R. 277). Dr. Gooch's clinical impression was the Plaintiff had Sciatica. Id. Accordingly, the Plaintiff was given "a shot of Dilaudid 1mg IM, Toradol 60mg IM, Decadron 10mg IM, and Valium 5mg by mouth." Id. Additionally, the Plaintiff was prescribed Naprosyn, Vicodin, and Robaxin. Id.

On June 10, 2013, the Plaintiff was seen at the Ohio Valley Medical Center ER for a pulled back muscle. (R. 289).  The attending physician noted the history of Plaintiff's complaint as:

> The patient is a 48-year-old white male who presents to the emergency department. He states he was seen here last week for injury to his back. He states this occurred while he was at work. States he thought it would get better. States he was not following a comp claim then. He states that he had injured his back while lifting block and building a wall in the mine. He states he has pain in the mid back, which radiates into the right leg. He had some numbness in the right lateral thigh and the medial right calf. States the pain is also in the posterior right hip. He denies any saddle anesthesia. He denies bowel or bladder incontinence. He states that the right leg occasionally "kicks out."

Id. Dr. Hrutkay's impression was that the Plaintiff suffered from "acute lumbar strain" and "right sciatica." Plaintiff was advised he would need a referral to Occupational Health for a follow up because his back pain had turned into a comp. claim. Id. Accordingly, the Plaintiff was given IM injections of Dilaudid and Toradol and prescribed Naprosyn, Robaxin and Norco. Id.

On July 30, 2013, the Plaintiff visited Wood Health Care Clinic complaining of lower back pain which had been presenting for approximately two months and was the result of a work related accident. (R. 391). The doctor noted that the date of the injury was May 31, 2013, and that: "[Plaintiff] was lifting a block and felt and heard a pop in his lower back. He had instant back pain that went into right hip and down right leg." Id. The doctor assessed Plaintiff as having "Strain Sprain Lumbar Spine," and administered a Kenalog 40mg/Decadron 4mg injection. (R. 392). Additionally, Plaintiff was prescribed 550mg Anaprox DS Tablets, 4mg Zanaflex, and 50mg Ultram Tablets. Id. Plaintiff was referred to physical therapy three times a week for four weeks and advised to avoid heavy lifting, bending, twisting, and unexpected movements. Id. To treat the musculoskeletal injury, Plaintiff was prescribed "rest, ice, compression, and elevation (RICE). Ice the first 24-48 hours for 15-20 minutes at a time. Then warm compresses 3-4 times a day for 30-40 minutes at a time." Id. Special testing, X-rays, and an MRI scan were ordered accordingly. Id.

On August 27, 2013, the Plaintiff visited Wood Health Care Clinic complaining of back and leg pain. (R. 389).  Plaintiff alleged that his lower back pain remained the same ever since his work related injury. Id. The medical records noted that the pain was "in the middle, and with radiation to right leg." Id. Plaintiff denied pain down his left leg, numbness in the leg, bowel problems, and bladder problems. Id. Dr. Wood assessed the Plaintiff as having "Pain Lumbar Spine," and administered a Kenalog 40mg/Decadron 4mg injection and was additionally prescribed 50mg Ultram Tablets, 4mg Zanaflex, and 15mg Mobic Tablets. Id.

On October 1, 2013, VA doctor Viswanathan Chokkavelu, M.D., noted that the Plaintiff had "iron deficiency anemia" based upon lab results. (R. 316). Dr. Chokkavelu ordered "ferrous gluconate" and noted the Plaintiff would need "upper and lower endoscopy if he has not had it in the last year." Id.

On October 10, 2013, VA doctor, Viswanathan Chokkavelu, M.D., conducted a "Spine Lumbosacral" examination of the Plaintiff. (R. 335). Plaintiff's spinal x-rays revealed "decreased disc space at L5-S1" and "facet hypertrophy and osteophytosis . . . throughout the lumbar spine consistent with mild degenerative disease." Id. Dr. Chokkavelu requested outpatient physical therapy for the Plaintiff, noting that the Plaintiff was experiencing "back pain numbness of right leg and right ls radiculopathy slr positive right." Id. at Additionally, Dr. Chokkavelu noted that Plaintiff "can bear weight," but that the condition was "chronic"—existing for longer than three months. Id. Dr. Chokkavelu assessed the Plaintiff as having "back pain with right ls radiculopathy, C3 vertebra arthritis," and COPD. Id. at 368.

On October 18, 2013, the Plaintiff was seen by Patricia Bosquet, MSW, for an Advance Directive/psychosocial assessment. Id. at 310. During the psychosocial assessment, the Plaintiff's suicide risk was assessed Id. at 314. Bosquet noted that the Plaintiff had "no suicidal

ideation" and had "never made a suicide attempt. Id. at 315. Bosquet indicated the Plaintiffs

illnesses were "Depression" and "Alcohol Abuse." Id. During the assessment, the Plaintiff

complained of "severe emotional distress," "recent intoxications," and "physical pain." Id.

Bosquet further noted that "there is no indication of current acute risk factors" and that the

Plaintiff "presents limited baseline risk factors." Id. Ultimately, Bosquet decided "no

modifications necessary" for the Plaintiff's treatment plan.

On December 5, 2013, VA General Radiologist Vidhi A. Gupta issued a radiology report

on Plaintiff's lumbar spine MRI. Radiologist Gupta's findings state:

> Vertebral body heights are normal. There is grade 1 anterolisthesis of L5 on S1
> along with disc desiccation and decreased disc space at this level. Decreased disc
> space and disc desiccation is also seen at L4-L5 levels. Conus terminates
> normally. Visualized spinal cord is normal. There is no abnormal signal in the
> vertebral bodies bone marrow.

(R. 499). Radiologist Gupta's impression states:

> 1. 5x5x5 cm intradural lesion in the spinal canal at L4-L5 level. Differential
> includes nerve sheath tumor like shwannoma however, this could also represent a
> conjoined nerve root. Recommend repeat MRI with gadolinium.
> 2. Degnerative disease at L4-L5 and L5-S1 levels.

Id.

On January 9, 2014, VA Radiologist Raymond Koku Awayena issued a radiology report

on Plaintiff's MRI of the lumbar spine—with a correlation to Plaintiff's previous examination

from December 5, 2013. (R. 496). Radiologist Awayena's findings state:

> The previously described well circumscribed 5mm intradural lesion closely
> related to the right L5 nerve root in the lateral recess of the spinal canal at L4-L5
> level demonstrates homogenous intense enhancement on postcontrast images.
> Additionally, there is a 3mm similar intensely enhancing lesion of the anterior
> cauda equine nerve roots at the superior L3 level. Findings are compatible with
> nerve sheath tumors, typically neurofibromas or schwannomas. Mild to moderate
> degenerative disc disease is again noted at L4-L5 and L5-S1. There is no spinal
> canal stenosis or significant neural frontal narrowing at the level.

Id. Radiologist Awayena's impression states:

11

> Two well defined enhancing lesions in the lumbar spinal canal; a 5mm intradural lesion closely related to the right L5 nerve root in the lateral recess of the spinal canal at L4-L5 level and a 3mm lesion of the anterior cuada equine nerve roots at the superior L3 level are compatible with nerve sheath tumors, typically a nuerofibromas or shwannomas. Differential consideration is metastatic disease which is felt to be less likely in the absence of a known primary tumor. Recommend contrast-enhanced MR imaging of thoracic and cervical spine as well as the brain to evaluate for other lesions.

(R. 497).

On January 15, 2014, Avemaria Bacher issued a radiology report on the Plaintiffs lumbosacral spine—with a comparison to a radiology report issued on October 10, 2013. (R. 494). Radiologist Bacher's findings state:

> Lumbar spine in 5 views including lateral views obtained in neutral, flexion, and extension demonstrates vertebral bodies to be normal in height. Alignment is normal without instability in flexion or extension. Disc space narrowing and spurring are present at L4-L5 and L5-S1. Visualize sacroiliac joints are normal. No focal lytic or blastic lesions are noted. Bone mineralization is normal.

Id.  Radiologist Bacher's impression states: degenerative changes lumbar spine. No instability in flexion or extension and no change. Id.

On January 17, 2014, the Plaintiff visited Wood Health Care Clinic complaining of back, right leg pain, which presented on his right side and down his right leg. (R. 387). The medical records noted that a previous MRI had determined that lesions were found on the L3 and L5 and noted that more testing will occur to determine if there are tumors. Id. The doctor assessed the Plaintiff as having "Strain Sprain Lumbar," and administered a Kenalog 40mg/Decadron 4mg injection. (R. 375). The Plaintiff was also prescribed Norco Tablets and advised to return in one month. Id.

On January 21, 2014, Plaintiff visited the doctor complaining of lightheadedness and feeling like he was going to pass out for approximately one week, but intermittently, and gastroesophageal reflux. Id. at 384. Plaintiff also complains of indigestion, dysphagia, bloating,

and belching. Id. Plaintiff, however, denies "room spinning, patient spinning, nausea, vomiting, dizziness triggered by head movements, imbalance, difficulty speaking, chest pain, dyspnea, palpitations, numbness/tingling in the arms and legs, ETOH/Tobacco/Illicit drug use, hematochezia, hematemesis, fever, and chills." Id.

On February 6, 2014, the Plaintiff visited Wood Health Care Clinic complaining of an on and off face rash that he had been experiencing for two months. (R. 382). Plaintiff's blood pressure had been previously checked and was high. Id. Plaintiff has denied "chest pain, dyspnea, sweating, and leg edema." Id. Dr. Wood assessed the Plaintiff as having Tinea Corporis and Hypertension HTN and prescribed 10mg Lisinopril. Id. at 383.

On February 21, 2014, VA Radiologist AMR A. Amourad interpreted the Plaintiff's MRI of the thoracic spine. Radiologist Amourad's findings state:

> Alignment is unremarkable. Degenerative changes with marginal osteophyte formation and diminished height and hydration signal of the discs. There is minimal disc bulges at T6-T7 and T7-T8 levels, questionable clinical significance. Otherwise, there is no disc herniation, significant spinal canal stenosis or neural foraminal narrowing at any of the visualized levels. There is no evidence of intradural masses or lesions. No definite abnormal signal intensity within the visualized portion of the spinal cord. No areas of abnormal contrast enhancement could be identified.

(R. 488). Radiologist Amourad's impression states, "No definite areas of abnormal contrast enhancement could be seen. No evidence of large disc herniation, significant spinal canal stenosis or neural foraminal narrowing." Id.

On February 21, 2015, VA Radiologist Amourad issued another radiology report on Plaintiff's MRI of the cervical spine. Radiologist Amourad's findings state:

> There is loss of normal cervical lordosis. Degenerative changes with marginal osteophyte formation and diminished height and hydration signal of the discs. There is no evidence of intradural masses or lesions. No definite abnormal signal intensity with the visualized portion of the spinal cord. The craniocervical junction is unremarkable.

(R. 490). Radiologist Amourad's impression states, "[m]ultilevel degenerative disc disease, notably at C5-C6 and C6-C7 levels, as described below." Id. at 491. On February 25, 2014, Plaintiff returned for a follow-up doctor's appointment with regard to his lower back pain—more specifically, exertional chest discomfort and exertional dyspnea. Id. at 380. Plaintiff denied chest pain, shortness of breath, and swelling of the legs. Id. Plaintiff underwent a CT scan that showed several tumors. Id. As a result, Plaintiff underwent a CT scan of the brain. Id. The medical records also depict that Plaintiff was "in the hospital a week ago for chest pain. He is scheduled to have a stress test."

On March 31, 2014, Plaintiff had a follow-up doctor's appointment for his back pain. (R. 378). Plaintiff reported that his lower back pain has remained with no changes. Id. At his previous visit, Plaintiff was referred to the VA due to the fact that he does not have an active workers compensation case and the VA's doctor has been managing Plaintiff's care. Id. Plaintiff suffers from pain in his "right side, and with radiation to right leg," as well has pain down the right leg and accompanying numbness. Id. Plaintiff denies any issues with his bowels, bladder problems, and "foot drop." Id.

On May 6, 2014, the Plaintiff visited the VA clinic complaining of back pain Tracey M. O'Connel, RN, BSN, noted that:

> Patient presents to clinic with complaints of back pain. Patient states that his right lower back is in constant pain radiating down his right leg to the knee. Patient states that he has been taking gabapentin and is ns not helping at all. Patient states that when he took the Flexeril along with Vicodin he felt much better but now that he no longer has Vicodin, he is in pain all of the time that he rates at a "10" at all times. He states that it is worse when he bends over. He states that the only time that his pain is not a "10" is when he is sleeping. Patient also questioned if he is to have a repeat MRI. He states that he was told in February that repeat MRI was recommended as there were lesions on his L3 and L5. Patient was given a f/v with provider on Monday 5/12/14.

14

(R. 571). Shauna N. Bradshaw, CRNP, clarified the Plaintiff's MRI history over the last couple

of years in an addendum, stating:

> Repeat MRIs were done. First one was in Dec of 2013. Second in January of
> 2014. Then ~ one month later, he had recommended cervical, thoracic, and brain
> MRIs. There was no indication that any repeat MRIs needed done from the last
> ones done in February. Brain showed old CVA, thoracic [sic] MRI negative. And
> C6 and C7 showed arthritis no impingement on spinal nerves. Neurosurgery
> consult recommended updated MRI in 3 months which is on time for. His MRI
> showed mild to moderate arthritis in his lower lumbar spine.

Id. at 563.

On February 21, 2015, VA Radiologist Amourad issued another radiology report on

Plaintiff's MRI of the brain. Radiologist Amourad's findings state:

> A small area of CSF signal intensity in the region of left caudate, probably due to
> old infarct. A surrounding hemosiderin ring is noted. Otherwise, there are no intra
> or extra-axial masses or collections. There is no mass-effect, or midline shift. The
> ventricular system is unremarkable for the patient's age. The craniocervical
> junction is unremarkable. Limited scans through the orbits and paranasal sinuses
> are unremarkable.

(R. 493). Radiologist Amourad's impression states, "[o]ld lacunar infarct in the region of left

caudate. No definite evidence to suggest acute intracranial process." Id.

On February 25, 2014, the Plaintiff visited Wood Health Care Clinic complaining of back

pain, chest pain, shortness of breath, and swollen legs. (R. 380).The Plaintiff also needed refills

for pain pills, to which Dr. Wood advised the Plaintiff that, "I will not get involved and . . . [you]

will avhe [sic] to go back to the VA for this." Id. Dr. Wood assessed the Plaintiff as having

Hypertension HTN and Chest Pain, prescribing 20mg Lisinopril. (R. 381).

On March 31, 2014, the Plaintiff visited Wood Health Care Clinic needing refills for pain

medication. The doctor noted that:

> The patient is here following up on their back pain. The low back pain has,
> remained the same. Patient had a workers comp claim for the back which has
> been denied. He has an attorney and is fighting for the claim. He has been seen
> through the VA and had work up. He is wanting refill of pain medication. At the

last visit he was told by Dr. Wood that he needs to follow the VA for this because
he does not have active comp case and they have been managing the care and
work up, not us.

(R. 378). The doctor assessed the Plaintiff as having "Pain Lumbar Spine," and administered a

Kenalog 40mg/Decadron 4mg injection. Id. Notably, the doctor did not refill the Plaintiff's pain

medication as requested for the same reasons specified in the doctor's notes. Id.

On April 24, 2014, Dr. Wood conducted an exercise and stress test on the Plaintiff. (R.

433). The Plaintiff underwent standard Bruce protocol, and the exercise lasted for nine

minutes. Id. Under clinical response, Dr. Wood noted that, "[t]he patient had no chest pain or

shortness of breath. There were premature ventricular contractions." Id. Based upon the exercise

and stress test, Dr. Wood's impression states:

1. Negative exercise test for exercise induced ischemic EKG changes.
2. The patient had no clinical exercise induced symptoms.
3. Good aerobic work capacity at a moderate work load.
   Nuclear Test Results:
1. No significant reversible defect identified on nuclear imaging
2. Normal wall motion and perfusion with ejection fraction of 66%
3. Lung/heart ratio within normal limits.

Id. at 434.

On June 27, 2014, VA doctor Shauna N. Bradshaw, M.D., gave her impressions on the

Plaintiff's lumbar spine MRI in a radiology report. (R. 484). Comparing the Plaintiff's MRIs

from December 5, 2013 and January 9, 2014, Dr. Bradshaw's findings stated:

Again noted is a well circumscribed 5mm intradural lesion closely related to the
right L5 nerve root in the lateral homogenous intense enhancement on
postcontrast images. Additionally, there is a stable 3mm similar intensely
enhancing lesion of the anterior cauda equine nerve roots at the superior L3 level.
Findings are compatible with nerve sheath tumors, typically a nuerofibromas or
schwannomas. Mild-to-moderate degenerative disc disease is again noted at L4-
L5 and L5-S1. There is no spinal canal stenosis or significant neural frontal
narrowing at the level.

Id.

16

Dr. Bradshaw's impression stated, "Stable two intradural small enhancing lesions since 12/5/2013, suggestive of neurogenic tumors. Your lower back shows arthritis. It also shows two stable benign lesions that were there in December." (R. 468-9).

On May 6, 2015, the Plaintiff visited Wood Health Care Clinic needing to speak with Dr. Wood about prostate and pain management recommendations. (R. 476). The Plaintiff also complained about "reduction of erectile size and rigidity and inability to maintain erection." Id. Dr. Wood assessed the Plaintiff as having "Erectile Dysfunction" and "Hypertension." Id. at 477. Accordingly, the Plaintiff was prescribed 50mg Viagra Tablets. Id.

On July 23, 2015, the Plaintiff visited Wood Health Care Clinic complaining of anxiety and depression, namely, "not sleeping well, anxiety, nervousness, crying over little things, not wanting to do anything, lost interest of the things  he like to do." (R. 472).  The doctor Bartsche noted the Plaintiff had spent the last year in prison for a DUI, and while he was in prison the Plaintiff's two year old son drowned. Id. The doctor assessed the Plaintiff as having "Anxiety/Depression, Bereavement Uncomplicated, GERD," and "BMI 28 adult." Id. at 474. Accordingly, the Plaintiff was prescribed 40mg Celexa Tablets, 500mg Depakote Tablets, 40mg Nexium Capsules, and 0.5mg Xanax Tablets. Id. Furthermore, the Plaintiff was advised to reduce stress, lose weight, and avoid alcohol consumption. Id.

On July 27, 2015, Jasmine T. Trouten, M.D., conducted a Depression and PTSD screen on the Plaintiff. (R. 553). Dr. Trouten noted that the Plaintiff scored a three for the depression screen, which is positive for depression. Id. Dr. Trouten further noted that the Plaintiff scored a three for the PTSD screen, which is positive for PTSD. Id. at 554. Dr. Trouten recommended that the patient had "no evidence of hopelessness or current suicidal thoughts . . . is not at risk for

suicide by evaluation. . . non urgent interventions are recommended." Id. at 554-55. A suicide crisis hotline number was given to the Plaintiff. Id.

On August 6, 2015, VA Doctor, Philip Lee, M.D., reviewed the Plaintiffs lumbar spine MRI from June, 2014, and stated:

> Mri lumbar spine reviewed. Shows lesion at right l5 nerve root and at l3. Lesions appear stable compared to prior in 2014 and 2013. It appears that he is obtaining emg/ncs studies. Pt may benefit from a right l5 selective nerve root block to see if this provides symptomatic relief. Surgery for this lesion would have significant risk of permanent motor weakness that outweighs the potential benefit. Please obtain repeat imaging in 1 year.

(R. 527). On the same date, VA Psychologist, Jenelle C. Fitch, conducted a psychology consultation with the Plaintiff. (R. 528). Dr. Fitch's notes state:

> Veteran reported the death of his two-year-old son in August 2014. He noted his son drowned in the neighbors' pool while trying to get his ball. He reported experiencing recurrent, involuntary, and intrusive distressing memories of the event, recurrent distressing dreams, and intense psychological distress at exposure to internal or external cues that resemble and aspect of the event. The veteran noted he was incarcerated at the time of his son's death, which increases his guilt, "because I would have had him that day." The veteran noted persistent feelings of guilt, diminishthed [sic] interest or participation in significant activities, persistent inability to experience positive emotions, irritability, hypervigilance, and poor concentration/memory.
>
> The veteran reported a history of depression since early adolescence after his brother died in a car accident . . . [v]eteran denied a history of suicide attempts . . . [v]eteran reported occasional passive suicidal ideation but denied active ideation, intent or plan.

Id. at 529. Dr. Fitch's impression was that the Plaintiff had "Posttraumatic Stress Disorder" related to his son's death, "Alcohol Use Disorder," "Anxiolytic Use Disorder," and "Social Anxiety disorder. Id. The Plaintiff was then referred to telepsychiatry for a medication evaluation and scheduled for a follow-up with Dr. Fitch three weeks from the date. Id. at 529-30.

On August 31, 2015, the Plaintiff visited Psychologist Jenelle C. Fitch for his follow-up session. (R. 530). The Plaintiff reiterated his son's tragic death and the resulting emotional

18

symptoms he had been suffering. Furthermore, the Plaintiff discussed his history of depression, anxiety, substance abuse, and anger/violence. Id. at 531. Dr. Fitch's impression was that the Plaintiff had "Posttraumatic Stress Disorder" related to his son's death, Recurrent-Moderate "Major Depressive Disorder," Alcohol Use Disorder," "Anxiolytic Use Disorder," "Cannabis Use Disorder," and "Social Anxiety disorder. Id. at 532. The Plaintiff was then referred to telepsychiatry for a medication evaluation and scheduled for a follow-up with Dr. Fitch three weeks from the date. Id.

Also on August 31, 2015, Alison Peterson, M.D., conducted a diagnostic study report to evaluate the Plaintiff for "right lumbosacral radiculopathy." (R. 561). Under "physical examination," Dr. Peterson noted that, "Of his lower extremities showed normal muscle bulk and tone without any focal weakness." Id. Dr. Peterson's impression states, "This right lower extremity EMG/NCS is normal. There is no electrodiagnostic evidence of a lumbosacral radiculopathy or for another neuropathic process." Id. at 562.

On September 3, 2015, CRNP Joeseph Truskowski conducted a psychiatry consultation on the Plaintiff. CRNP Truskowski described the Plaintiff as "very sad and depressed," "very flat," and emotionless. (R. 519). CRNP Truskowski explained that Plaintiff's son drowned due to the negligence of Plaintiff's girlfriend at the time. Id. As a result, the Plaintiff became depressed, angry, and anxious. Id. CRNP Truskowski further noted that Plaintiff began experiencing panic attacks and started avoiding interaction with people. CRNP Truskowski assessed the Plaintiff as having PTSD, Panic Disorder, Agoraphobia, and Bipolar II Disorder. (R. 520). Accordingly, the Plaintiff was advised to discontinue medication from non-VA provider. Id. Additionally, the Plaintiff was prescribed 40mg Latuda, 30mg Cymbalta, and 0.5mg Klonopin. Id.

On the same date, September 3, 2015, Psychologist Jenelle C. Fitch conducted the first session of Plaintiff's individual psychotherapy. (R. 581). The Plaintiff expressed "continued, occasional experiences of bereavement and depression . . . [and] continuing to feel anger, betrayal, and guilt." Id. The Plaintiff stated, "I have good days and bad days . . . the last couple of days have been bad." Dr. Fitch's impression was that the Plaintiff had "Posttraumatic Stress Disorder" related to his son's death, Recurrent-Moderate "Major Depressive Disorder," Alcohol Use Disorder," "Anxiolytic Use Disorder," "Cannabis Use Disorder," and "Social Anxiety disorder. Id. The Plaintiff was advised to continue individual therapy for symptoms of bereavement and PTSD and to return for follow up two weeks from the date. Id.

On September 17, 2015, Psychologist Jenelle C. Fitch conducted the second session of Plaintiff's individual psychotherapy. (R. 579). The Plaintiff expressed "continued symptoms of bereavement and depression" and that "the medication has alleviated some of the depression symptoms," but also reported that, "some days are still hard." Id. Dr. Fitch's impression was that the Plaintiff had "Posttraumatic Stress Disorder" related to his son's death, Recurrent-Moderate "Major Depressive Disorder," Alcohol Use Disorder," "Anxiolytic Use Disorder," "Cannabis Use Disorder," and "Social Anxiety disorder." Id. at 580. The Plaintiff was advised to continue individual therapy for symptoms of bereavement and PTSD and to return for follow up two weeks from the date. Id.

On September 30, 2015, VA Radiologist Avemaria Bacher issued a radiology report on the Plaintiff's MRI of the lumbar spine. The radiology report compared MRIs of the lumbar spine from December 5, 2013, June 27, 2014, and a lumbar spine x-ray from January 15, 2014. Radiologist Bacher's findings state:

> The lumbar alignment is normal. A normal in height. There is a loss of height and
> signal the L4-S1 intervertebral disc space with discogenic endplate changes again

noted. No abnormal signal intensity is visualized in the lower thoracic cord. A well-circumscribed, homogenously enhancing 5mm intradural lesion adjacent the right L5 nerve root in the lateral recess at L4-L5 best seen on postcontrast axial image 14 appears unchanged. A previously noted 3 mm enhancing focus along the L3 level superiorly is noted on sagittal image 8 postcontrast, but not included on the post contrast axial images.

(R. 623-24). Radiologist Bacher's impression states:

Stable since 2013 enhancing small intradural lesion adjacent the right L5 nerve root, suggestive of neurogenic tumor. Second tiny intradural enhancing nodule at the superior aspect of L3 is noted on the postcontrast sagittal images but was not included on the axial images, it appears grossly stable. Degenerative changes lower lumbar spine.

(R. 624).

A discharge summary, dated October 13, 2015, summarized that on October 5, 2015, the Plaintiff attempted suicide via overdosing on Alcohol, Alprazolam, and Clonazepam. (R. 631). On October 6, 2015, the Plaintiff was admitted into the ER where he reported "significant guilt and hopelessness following the death of his 2 yo son by drowning." Id. The Plaintiff admitted an increase in suicidal ideation for the past two months. Id. The Plaintiff denied any further thoughts of suicide, and reassured the attending physician, Steven R. Graham, that he would seek help from staff if he had more suicidal thoughts. Id. at 632. Dr. Graham advised the Plaintiff to continue taking 40mg Duloxetine (for back pain), 40mg Lurasidone daily. Id. at 633.The Plaintiff was also advised to discontinue Clonazepam. Id. The Plaintiff was later discharged that day for responding "well to impatient treatment with significant reduction in presenting symptoms, and [because] there are no acute psychiatric contraindications." Id. at 634.

Also on October 6, 2015, Vanessa M. Beck, MSW, wrote a social work note detailing the factors leading to the Plaintiff's attempted suicide. (R. 656). The Plaintiff explained that he felt "tremendous guilt and grief related" to his son's death. Id. The Plaintiff had heard a song the day of his attempted suicide that reminded him of his son. Id. In turn, the Plaintiff

decided to get intoxicated and take twenty Xanax tablets and 8-10 Klonopin. Id. The Plaintiff also noted that his back injury, inability to sustain work, and girlfriend breaking up with him added to his depression and feeling like his life was "not worth living." Id.

Psychologist Jenelle C. Fitch also met with the Plaintiff on October 6, 2015, to conduct his third psychotherapy session. (R. 677). The Plaintiff discussed much of the same factors as he did with Vanessa Beck leading to his attempted suicide. Id. Dr. Fitch's impression was that the Plaintiff had Post-traumatic Stress Disorder" related to his son's death, Recurrent-Moderate "Major Depressive Disorder," Alcohol Use Disorder," "Anxiolytic Use Disorder," "Cannabis Use Disorder," and "Social Anxiety disorder." Id. The Plaintiff was advised to continue individual therapy for symptoms of bereavement and PTSD. Id.

On October 7, 2015, Plaintiff was provided with a suicide prevention note memorializing the Plaintiff's disclosures. (R. 657). The Plaintiff disclosed he was still grieving the loss of his son. Id. The Plaintiff expressed extreme guilt at his absence when his son passed, and stated he had "increasingly repetitive thoughts to join him by committing suicide." Id.

Also on October 7, 2015, Recreational Therapist, Michelle L. Mosser, interviewed the Plaintiff with the purpose of constructing a recreation therapy program for the Plaintiff. (R. 719). In that interview, Therapist Mosser noted his current interests as:

> Fishing, Crafts, TV, Exercise, Other: Veteran describes his daily routine/interests as: "Usually, I go out in the garage & work on something". Patient indicates he enjoys working on his "4-wheeler & riding lawnmower keep me busy". When asked by therapist, Patient indicates no additional current/past leisure hobbies other than "I try to take a walk" and "I still fish, just not as much as I used to". Per medical record, pt. also enjoys watching tv (esp. comedy), surfing the internet, playing w/his father's dog, crafts/welding and mechanical work, when able. Also, he reports talking w/his daughter on the phone "just about everyday"; unable to identify any social support system(s) other than "my stepfather, brother and an uncle" as well as specifically mentioning his daughter and "my 4 great-grandchildren, but I don't have any grandchildren?".

(R. 719-720).

On October 14, 2015, the Plaintiff was contacted by Suicide Prevention as "a requirement of being on the High Risk for Suicide List." (R. 721). The Plaintiff denied having suicidal thoughts, plan or intent when asked. Id.

On October 22, 2015, Suicide Prevention Case Manager, Veronica R. Lucious, reported that the Plaintiff had left a message the night before. (R. 720). Evidently, the Plaintiff had missed a call from Suicide Prevention and left a message reflecting his regret in missing the call. The Plaintiff had missed the call because he was hunting for deer with a bow and arrow. Id. The Plaintiff denied having any recurring suicidal thoughts when asked. Id.

### C.  Medical Reports/Opinions

#### a.  *Disability Determination at the Initial Level*

On October 14, 2013, agency reviewer Dominic Gaziano, M.D., reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 84). The Disability Determination Explanation indicated that no RFC/MRFC assessments were associated with the claim. (R. 83). The Disability Determination states that Plaintiff alleges the inability to function as of May 31, 2013, due to his lower back and sciatic nerve in right hip. (R. 79). On September 9, 2013, Dr. Gaziano spoke with the Plaintiff who did not go to the Occupational Health, as referred on June 10, 2013. (R. 81). The Report also stated that Plaintiff

> Sometimes [has] a problem with dressing, takes care of children, needs reminders for meds and personal care, prepares food, does [household] chores, goes out everyday if possible, goes out alone, drives, shops once a week 2-3 [hours], able to pay bills, watches tv, reads, spends time with others, goes to church, uses computer, goes to church daily for lunch, problems with lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, and getting along with others, cab walk couple hundred feet and rest 5-10 minutes, does not do well with written instructions, does fair with spoken ones, has panic attacks around authority figures, does not do well with stress and change in routine, uses cane.

(R. 81).

The Report also stated that:

> 48 year old male with marked on additional problems with getting along with others, and does not do well with stress . . . [and] he does not see anyone for his depression and that he is not taking any meds at this time and that it comes and goes depending on how he is feeling with his back.

(R. 81).

On October 8, 2013, agency reviewer, Joseph Richard, reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. (R. 82). Richard found that no mental medically determinable impairments were established. (R. 82). The Report also indicates that "credibility appears to be partially credible based on information in file." (R. 83).

**b.** ***Disability Determination at the Reconsideration Level***

On January 24, 2014, agency reviewer, Thomas Lauderman, M.D., reviewed the prior RFC assessment and completed a physical residual functional capacity ("RFC") assessment. (R. 90-92). The Report states that there has been a change in the illness, injuries, or conditions since the initial report, including "anxiety, depress, back, hip." (R. 87). The Report stated:

> Since that date and after the initial decision, he reports depression and anxiety. 10/10/13 physical exam shows diagnoses of anxiety state, NOS; alcohol dependence, and depressive order. However, review of systems states no depression or anxiety. Psych was negative; not depressed or suicidal or homicidal. He spoke with a social worker at the VA hospital on 10/18/13, for advanced directive consult. Record shows alcohol abuse and depression. Expressed interest in rehab, but did not follow up. . . . Exam: Lumbar spine x-rays show degenerative changes, especially at L5-S1. Physical diagnoses: esophageal reflux, back pain with right radiculopathy, c# vertebra arthritis, and COPD. Lungs normal to inspection, percussion and no rales, wheeze, or rhonchi. Normal joint exam. No significant joint deformities. Good muscle tone, bulk, and strength. No tremors or weakness. Gait steady and normal. Neuro exam grossly nonfocal. Cranial nerves intact. Strength grossly intact. Sensation grossly intact. Finger to nose exam intact. DTRs normal.

(R. 89).

Reviewer Lauderman found the following exertional limitations: Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, walk, and/or sit for about six (6) hours in an eight (8) hour workday; and unlimited pushing and/or pulling. (R. 91). As to postural limitations, Reviewer Lauderman found that Plaintiff could occasionally climb ramps, stairs; ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl. Id. No manipulative, visual, or communicative limitations were found. Id. As to environmental limitations, Plaintiff could have unlimited exposure to wetness, humidity, and noise. (R. 92). Plaintiff should avoid even moderate exposure to vibration; and extreme cold and extreme heat and to hazards. Id.  Plaintiff could have unlimited exposure to fumes, odors, dusts, gases, poor ventilations, etc. Id.

On January 20, 2014, agency reviewer, Timothy Saar, Ph.D., reviewed the prior PRT assessment and determined that there were no mental medically determinable impairments established. (R. 89-90).

**D.    Testimonial Evidence**

At the ALJ hearing held on December 3, 2015, Plaintiff testified that he was divorced and his 18-year old daughter lives with him. (R. 47). He indicated that at the time of the hearing, he received medical benefits from the Veterans Administration. (R. 50).  He also testified that he drew unemployment for approximately six months after Plaintiff was terminated.

Plaintiff testified that he was in the Army from 1984 to1987 and was an attack helicopter repairman. (R. 50). At the time of the hearing, he advised that he was actively certified to work in the coal industry. Id. His most recent job was as a buggy operator for Alliance Coal, and his last day there was May 31, 2013. (R. 51). Plaintiff testified that he injured his back and following that injury, he was fired from his position. Id. Plaintiff testified that he worked as a drill operator

25

at the same mine for another year putting in a shaft for Frontier Kemper. (R. 51, 54). He stated

that from 2012-2013, he worked at Tunnel ridge for Alliance coal as a buggy operator. (R. 51).

Plaintiff indicated that he also worked at Meigs Mine Service as a buggy operator as well. (R.

53). He testified that he worked at Strata Mine as a shift boss. Id. He stated he was a crew leader

for GMA Mine Repair. (R. 53). Plaintiff testified that he worked interchangeably as a buggy and

drill operator at Consol Coal, Emerald Coal, and American Energy Corporation. (R. 55). Plaintiff

stated that he also worked as a top trimmer for Nelson Tree Services. Id.

    Plaintiff testified that he first hurt his lower back lifting block while building a wall in the

mine. (R. 65-66). Plaintiff testified that it was not part of his regular job duties, as he was a

buggy operator, but:

> They assigned – they took a crew of guys and – because the mine was shut
> down, because a guy got his arm cut off. So they had –idle that they forced, so
> we – we build walls. And they picked the buggy operators, which were me and
> another guy, Charlie, and a couple of guys – operator, and another guy, just a
> general – general laborer, us four. And we built this wall.

(R. 66).

Plaintiff testified that his pain is:

> A:    Just a sharp pain, like somebody's taken something sharp and stabbing me
>       in my – in the middle of my lower back. And then it'll just – turns into a
>       throbbing. It's a constant pain. It just starts – it just doesn't go away.
>       I try to shift my weight around, to where it's not putting pressure on my
>       back. That relieves it some, But my arm – take the weight of my back, and
>       my arm's there.
> Q:    Now, you mentioned numbness in your right leg.
> A:    Yes ma'am
> Q:    Is it your whole leg, or is it a certain part?
> A:    It's – from my knee, down, I cannot feel – I cannot feel my – the front of
>       my leg. It's like numbness in my hip, going down  to my leg, but I can't
>       feel my right leg, in front of my knee, down.
> Q:    Now, you mentioned sitting, like you're sitting now, causes the pain.
> A:    Yes ma'am
> Q:    Is there anything else that causes the pain?
> A:    Picking up stuff, bending over, sitting too long, standing too long.

Q:     And do they have you on any medication to help?
A:     They have the – for muscle spasms, muscle – anti-inflammatory now.
Q:     And so what do you do to help relieve the pain?
A:     I just, basically, roll over on my side or something, or adjust my weight
       that goes down on my back, to take the weight off my spine.
Q:     Do you use heating pads or ice packs?
A:     I've got a TENS unit that I use, that I bought off of a guy.
Q:     Have the doctors recommended physical therapy?
A:     They did, at one time; and I was going to physical therapy and then the
       Veterans Administration called me and told me to stop going to physical
       therapy, because they had found tumors on my spine. And I --.
. . .
A:     -- they found four lesions on my spine, tumors.
Q:     So lesions? Okay, I saw that. Okay.
A:     And I haven't done physical therapy since. They've never recommended
       that.

(R. 59-61).

When asked by his attorney about the pain in his right arm, he testified that he was right handed, and described the pain as shooting down his middle finger and that it affected his coordination. (R. 61). He testified that he cannot do simple things like brush his teeth that that hand. Id. Plaintiff indicated that his strength in his right hand is not what it used to be and he cannot hold things in his hand, and things "want to slip out of his hand." (R. 61). He testified that he has difficulty taking care of household chores, including having to hire his daughter to clean the house, do the dishes, and fix meals. (R. 61). He stated that he is unable to mow the grass, and had to purchase a riding lawn mower that his nephews use to mow his lawn. Id. He also stated that he had difficulty lifting things and the heaviest weight he is able to lift/carry is approximately 20 to 25 pounds. (R. 62). He stated that he may be able "to walk a block, before I've got to stretch my leg out or – I mean, I've been getting lazier and lazier as time goes on, because it just – it bothers me to do anything." Id. Plaintiff described how his neck and lower back hurt more in cold weather than in warm weather. (R. 60). Plaintiff stated that he does not have hobbies, but "just UMWA, United Mine Workers Association." (R. 64).  He also stated that

27

he goes "to church all the time," but has not been there for a week and a half. (R. 64). Plaintiff also testified that he has his daughter grocery shop for him, but if he ever has to go grocery shopping himself, he uses the electronic ride-on buggy. Id.

He testified that he is able to sit for about 15-20 minutes at a time. He also stated that when he shifts his weight, his leg goes numb, and that there is not any one position that is most comfortable. (R. 62-63). Plaintiff testified that he has difficulty concentrating and focusing because of the pain, and indicated it affected his ability to carry on a conversations, disciplining his kids, and "just the – every little thing, it just revolves around my pain that's going down my legs and my lower back." (R. 63). Plaintiff additionally testified that his sleep is affected by his pain and he wakes up every one and a half to two hours, rolling over. Id. Plaintiff further indicated that his pain was at a 7/10 on a "good day" and his doctors indicated to him that his back pain was inoperable. Id. Plaintiff's doctors prescribed him gabapentin, but has since stopped taking it because "it made [him] delusional. It made [his] eyes blurry, and [he] couldn't – [He] couldn't read or couldn't see, couldn't watch tv, couldn't – couldn't look out the window, without trying to squint [his] eyes to get [his] vision --."  (R. 64). Plaintiff stated that he has not tried any other medications for the pain. (R. 64).

At the hearing, Plaintiff testified that he was in Alcoholics Anonymous and had been sent to prison after receiving his second DIU conviction--felony DUI. (R. 47-48). His time in prison was from July 2014 to July 2015. (R. 47). Prior to the felony DUI, he had been sent to court-ordered rehab in 2013. (R. 47-48). While he was in prison he went through the Residential Substance Abuse Training (RSAT). (R. 48). Since his release from prison, he has attended Alcoholics Anonymous meetings and has his one year chip, but does not have a sponsor. (R. 48-49). He stated that he had had alcohol one and a half months prior to the adjudication hearing,

and that was when he had been hospitalized at the Veterans Administration for a suicide attempt. (R. 48; 58). He was put on Deloxine [phonetic] and had been seeing a psychologist and a psychiatrist at the Veterans Administration once a month. (R. 59). Plaintiff indicated that his anxiety and depression were currently low level, but gets worse around Christmas. (R. 65). He associated these mental conditions with the passing of his son in August 2014. Id. He testified that they did not give him medication for his pain in prison, but he did have monthly therapy sessions to address his depression. Id. Plaintiff stated that with regard to his anxiety and depression, he tries to keep his mind busy. Id.

**E.    Vocational Evidence**

Also testifying at the hearing was, Dr. Larry Ostrowski, a vocational expert. (R. 70).

A.    The work he described as buggy operator, for a number of employers, would, according to the DOT, be shuttle car operator. That job, according to the DOT, is medium and semi-skilled, with an SVP of 4. The DOT is 932.683-022.

The tree-trimming work -- tree trimmer, according to the DOT, is classified as heavy and semi-skilled, with an SVP of 4. The DOT is 408.664-010. The work he described as shift boss,
I would characterize, according to the DOT, as section supervisor, which is classified as medium and skilled, with an SVP of 7. The DOT is 939.137-010.

He did testify that the most he would lift would be three pounds, Your Honor, but working in a coal mine, I would never want to indicate that the job would be anything but medium work, Your Honor. So I believe, -- despite his testimony, I would classify that job that way, as medium.

Q.    Yes, Your Honor -- or, sir.

A.    Okay.

Q.    The drilling work he described would be, according to the DOT, as I clarified, roof bolter. Roof bolter is classified as medium and semi-skilled, with an SVP of 4. The DOT is 930.683-026.

And he worked in the -- where he worked for the company that built mine shafts -- I would characterize that job as – and he described it as a drill operator. In that respect, I would characterize that job as earth boring drill

> operator. That job, according to the DOT, is classified as medium and semi-skilled, with an SVP of 4. The DOT is 859.682-010.

(R. 70).

With regards to Plaintiff's ability to return to his prior work, Dr. Ostrowski gave the

following responses to the ALJ's hypothetical:

> Q.   Okay. I ask that you assume an individual of the same age, education, and past work experience as the Claimant, with the following abilities. Said individual is capable of light exertional level work, can occasionally climb ladders, ropes, or scaffolds, ramps or stairs, balance, stoop, crouch, kneel, or crawl.
>
> Said individual must avoid moderate -- or, occasional extreme cold, moderate -- or, occasional extreme heat, moderate -- or, occasional excessive vibration, and moderate -or, occasional exposure to any hazards, such as dangerous, moving machinery and unprotected heights.
>
> Can an individual with these limitations perform the Claimant's past work?
>
> A:    No, your honor.

(R. 71-72).

Incorporating the above hypothetical, the ALJ then questioned Dr. Ostrowski regarding

Plaintiff's ability to perform other work at varying exertional but unskilled levels:

> Q:    [I]s there other work this individual can perform?
>
> A:    Yes, Your Honor. There would be the work of an office helper. This is a light and unskilled job, with an SVP of 2. In the local economy, there are 330 jobs; in the national economy, 86,000 jobs. The DOT is 339.567-010.
>
> There would be the work of a marker. This is a light and unskilled job, with an SVP of 2. In the local economy, there are 1,200 jobs; in the national economy, 250,000 jobs. The DOT is 209.587-034.
>
> There would be the work of a mail clerk. This would be an individual working in a mail room of a business, as opposed to working for the Postal Service. It is a light and unskilled job with an SVP of 2. In the local economy, there are 400 jobs; in the national economy, 71,000 jobs. The DOT is 209.687-026.

Q:      And if you assume the same individual limitations as described in the first hypothetical, with the additional limitation that said individual must be afforded the opportunity for brief one- to two-minute changes of position, at intervals not to exceed 30 minutes, without being off task, would the jobs you stated remain available?

A:      The jobs of office helper and mail clerk would remain, Your Honor, but the job of marker would not.

Q:      Would there be other jobs that would fit all the limitations given?

A:      Yes, Your Honor. There would be the work of an electrical accessories assembler. This is a light and unskilled job, with an SVP of 2. In the local economy, there are 200 jobs; in the national economy, 40,000 jobs. The DOT is 729.687-010.

Q:      If I add a limitation that said individual is capable of no more than frequent handling with the right upper extremity, would that affect any of the jobs that you stated?

A:      No, Your Honor. And my response would remain the same.

Q:      If that handling limitation is changed to occasional handling with the right upper extremity, would that affect any of the jobs that you provided?

A:      According to the Selected Characteristics of Occupations, Your Honor, the -- all four of those jobs require frequent handling.

Q:      Would there be any jobs, at the light exertional level, that would fit all of the limitation that have been given?

A:      Your Honor, there would be very few jobs, at the light level, that would - - where an individual would be limited to occasional handling, that would - - that would be available for such an individual.

Q:      And so would there be jobs at the sedentary exertional level with all the limitations previously given?

A:      And I'll assume that the also means occasional handling, Your Honor, Is that correct?

Q:      Yes, with the right upper extremity.

A:      The only job that would be available for an individual, limited as such, would be that of a surveillance system monitor. Surveillance system

monitor is a sedentary and unskilled job, with an SVP of 2. In the local economy, there are 75 jobs; in the national economy, 25,000 jobs. The DOT is 379.367-010.

Q:      Now, if the individual was limited to simple, routine, and repetitive tasks, in a low-stress job, defined as having only occasional decision making required, occasional changes in the work setting, and no strict production quotas; also, if said individual was limited to occasional interaction with the general public, co-workers, and supervisors, would that job of surveillance system monitor remain available?

A:      Yes, Your Honor.

Q:      What about the jobs that your provided at the light exertional level? Would those remain available with those additional limitations, those mental limitations?

[. . .]

Q:      Simple, routine, and repetitive tasks, in a low-stress job, defined as having only occasional decision making required, occasional changes in the work setting, and no strict production quotas; said individual capable of occasional interaction with the general public, co-workers, and supervisors.

A:      My responses would be the same to the - - four jobs - - officer helper, marker, mail clerk, and electrical accessories assembler.

Q:      Okay. Did the Claimant have skills from his past work, which would transfer into the sedentary residual functional capacity given?

A:      No, Your Honor.

Q:      And if the individual were off task or to miss work 20 percent of the work week or greater, would there be jobs available for this individual?

A:      No, Your Honor.

(R. 72-75).  Plaintiff's attorney chose not to question Dr. Ostrowski when provided the chance.

(R. 75).

**F.      Report of Contact Forms or Disability Reports**

A Disability Report was completed on August 22, 2013 and states that the Plaintiff was observed shifting in his seat over the course of his forty-five (45) minute interview and walked slowly with a limp. (R. 210).  It was observed that the Plaintiff has difficulty sitting, standing, and walking. Id. No medical evidence was brought by the Plaintiff to the Field Office and DDs capability development was not needed. Id. The report also states that Plaintiff's condition includes his lower back and sciatic nerve in his right hip, and he has stopped working on May 31, 2013, because of his "conditions." Id. at 213-214. Plaintiff weighs 198 pounds and 5' 8". Plaintiff reported that he was tested for his condition and was prescribed medication to treat the condition. Id. at 216.

A second Disability Report was completed on November 8, 2013, which states that Plaintiff is limited because of his anxiety, depression, back, and hip. Id. at 227-30.  In regard to his ability to care for his personal needs, Plaintiff stated that "everything takes longer" and reading the changes that have occurred since his last disability report was completed: "I can no longer work, I injured my back at work and I can't work. The doctor will not release me to work." Id. at 230.

Another Disability Report was completed on November 12, 2013 states that there was no initial level SSI claim on this case and no observations of the Plaintiff were made due to no contact with him. Id. at 233-4.

Another Disability Report was completed on March 21, 2014, and states that Plaintiff indicated that there were changes in his condition, stating "I can't as far as I could before now my hip and back pain is severe especially when I try to walk." Id. at 235. Plaintiff described the effect of his condition on his ability to care for his personal needs as follows: "I can't take baths because I can't get out of the tub. I do take showers but not daily because it hurts getting in/out.

Things do take me longer to do getting dressed, shoes, socks." Id. at 239. Plaintiff described the following changes in his daily activities since the last disability report he completed as follows: "I am unable to work and support myself and my family. I can't walk very far without severe pain in back and hips. I used to be able to walk for miles, now I'm lucky to walk 30 yards before taking a break." Id.

Another Disability Reported was completed on March 23, 2014, which states that no initial level SSI claim was made in this case, no observations or perceptions of the Plaintiff were noted, no medical evidence was brought to the field office by the Plaintiff, and no DDS capability development was needed. Id. at 242-43.

**G.     Lifestyle Evidence**

On an adult function report dated August 29, 2013, Plaintiff stated that he resides in a house trailer. (R. 219). He indicated that his condition does not allow him to control his right leg, his back hurts continually, his arms go numb and he cannot bend over completely without pain. Id. He stated that he cannot climb a ladder or carry anything of significant weight. Id. Regarding his daily activities, Plaintiff reported that he wakes up and eats, watches television, tries to do yard work and takes the trash outside and clean the house as much as possible. Id. at 220. He advised that he tries to avoid doing anything that will trigger pain. Id. He stated that he will fix a tv dinners, take a shower and then go to bed. Id. He indicated that his daughter and son live with him, and he feeds them, cleans their clothes and he bathes his son. Id. Plaintiff stated that he does not take care of his dog, but his daughter feeds the dog and she also helps take care of her little brother. Id.

He stated that before his condition manifested, he could do everything and could go to work to perform his job. Id. He indicated that now he cannot work. Id. Plaintiff stated that he

"wake[s] up at all hours [and] cannot keep a comfortable position" and that anxiety keeps him "tossing and turning." Id. He indicated that sometimes his condition does not always impede his ability to dress, but can be a problem sometimes. Id. He stated that he can shower and shave his head. Id. Regarding his ability to shave, he stated he has let his "hygiene go a little." Id. Plaintiff stated he can feed himself and use the toilet by himself. Id. He indicated that sometimes he needs reminders about his appearance depending on how he feels about his appearance. Id. at 221. Regarding reminders to take medication, he said he needed reminders to know how much medication to take and when it should be taken. Id.

Regarding meal preparation, Plaintiff stated that he prepares frozen meals (TV dinners), cereal, pancakes, eggs and toast. Id. He indicated that he prepares food daily and it takes him five to ten minutes to do so. Id. He stated that prior to the onset of his condition; he used to cook on the grill all the time. Id. Plaintiff stated that he cannot do this anymore because he cannot stand on his leg and hip for long periods of time. Id.

Regarding house and yard work, Plaintiff stated that he is able to wash clothes, vacuum, use the riding mower, and wash dishes. Id. He indicates that he does these chores once a week, if possible. Id. He stated that sometimes he cannot ride his lawn mower, vacuum, or wash dishes and will require help. Id. Plaintiff stated that he tries to do yard and house work when he is not hurting or limping. Id. at 222. He advised that he tries to go outside every other say when possible. Id. He indicated that when he goes out, he travels in a car and indicated that he can drive a car. Id. He indicated that he can go out alone, but it depends on the weather— whether it is raining or snowing. Id. He stated that he shops in stores and online, and shops for food, clothes, and cleaning supplies. Id. Plaintiff stated that he shops once a week and it takes approximately two to three hours. Id.

Plaintiff indicated that he is able to pay bills, handle a savings account, count change, and use a checkbook or money orders. Id. He stated that the way he handles money has changed because he "can't control money that [he] is not making anymore." Id. Regarding his hobbies and interests, he stated that these include watching television daily, reading the newspaper daily, riding ATVs, and working on vehicles approximately once a week. Id. at 223. His hobbies have changed since the onset of his condition to the extent that he now must pay his neighbor to work on his vehicles. Id.

With regard to his social activities, Plaintiff indicated that he spends time with others by going to church, talking on the phone, and using the computer. Id. at 223. He stated that he goes regularly to church and goes to the Simpson Church for lunch. Id. Plaintiff indicated that he needs to be reminded to go to appointments and that he only needs someone to accompany him when his back and hip are hurting. Id. He stated that he cannot be around crowds of people for very long and since the onset of his condition; he has anxiety attacks and is depressed a lot of the time. Id.

Plaintiff indicated that his condition affected his ability to walk, squat, bend, stand, sit, kneel, climb stairs, lift, and get along with others. Id. at 224. Plaintiff reported that "I can't lift a lot of weight, squatting hurts my back, bending hurts my hip and leg, standing irritates my leg, walking hurts my hip and leg, sitting is uncomfortable, kneeling, I can't kneel very long, can't climb stairs." Id. He indicated that he can only walk a couple hundred feet before needing to stop and rest, and when he does rest, it is for five to ten minutes. Id.

Plaintiff stated that his ability to pay attention depends if he is interested in the conversation. Id. Plaintiff stated that he is not good at following written instructions and sometimes he has to read the instructions over and over. Id. He stated that he follows spoken

instruction "pretty fair," though sometimes he has to be reminded. Id. Plaintiff indicated that he gets anxiety attacks around police and bosses. Id. at 225. He indicated that he had never been fired or laid off because of problems getting along with other people, but that he does not handle stress well and that he gets upset when he cannot "control the situation very well." Id. Plaintiff also stated that he does not handle change well and he likes to repeat procedures a lot. Id. He indicates that his unusual behaviors or fears are a result of his anxiety and depression. Id.

Plaintiff indicated that he uses a cane which aids Plaintiff in his walking. Id. at 225. Plaintiff indicated that he takes medication for his conditions, which include: Tramadol (HcL 50 mg), Meloxicam (15 mg), Zanaflex (HcL 4 mg), Zanax, and Nexium. Id. at 226. He indicated that none cause side effects. Id. Plaintiff remarked that ever since he could not work and does not have an income, his anxiety and depression has come back. Id. He stated that his thoughts have becoming worrying about his future, how he is going to make his bills, get paid, and feed his children. Id. He stated that it worries him "a lot." Id.

## I.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## II.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

4. **The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.**

5. **The claimant has not engaged in substantial gainful activity since May 31, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).**

6. **The claimant has the following sever impairments: degenerative disc disease of the cervical and lumbar spine; history of cerebrovascular accident; anxiety disorder; major depressive disorder; post-traumatic**

stress disorder ("PTSD"); bereavement; alcohol use disorder; and anxiolytic use disorder (20 CFR 404.1520(c)).

7.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 arid 404.1526).

8.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) (i.e. is able to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk, with normal breaks, for a total of about 6 hours in an 8-hour workday; sit, with normal break, for a total of about 6 hours in an 8-hour workday; with an unlimited ability to push and/or pull), except the claimant can only occasionally climb ladder, ropes, scaffolds, ramps, or stairs, balance stoop, kneel crouch, or crawl; must avoid moderate or occasional exposure to extreme cold, extreme heat, excessive vibration, and hazards (such as dangerous moving machinery and unprotected heights); is limited to simple, routine, and repetitive tasks, in a low stress job, defined as having only occasional decision making required, occasional changes in the work setting, and no strict production quotas; is capable of only occasional interaction with the general public, co-workers, and supervisors; and must be afforded the opportunity for brief, one to two minute, changes of positions, at intervals not to exceed thirty minutes.

9.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

10.    The claimant was born on December 21, 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

11.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

12.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

13.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

14.     The claimant has not been under a disability, as defined in the Social Security Act, from May 31, 2013, through the date of this decision (20 CFR 404.1520(g)).

## IV.     DISCUSSION

### A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment … if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (quoting Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Deputy Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964). As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." Lewis v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. Radford v. Colvin, 734 F.3d 288, 295-95 (4th Cir. 2013). An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." Lewis, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss every piece of evidence, Reid v. Commissioner, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

In reviewing the Deputy Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contention of the Parties

Plaintiff, in his Motion for Summary Judgment, asserts that the Deputy Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1).  Specifically, Plaintiff alleges that:

1.   The ALJ erred by "failing to find the claimant's sciatica to be a "severe" impairment within the meaning of the regulations";

2.   The ALJ erred by "erroneously rel[ying] on the assessment of the state agency consultant;

3.   The ALJ's erred by finding that Plaintiff can perform light work is not based on substantial evidence; and

4.   The ALJ's erred because its credibility determination of Plaintiff is not supported by substantial evidence.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 11, at 9-15). Plaintiff asks the Court to "remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence and proper legal standards." Id. at 14.

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

1.  The ALJ decision was correct because "disability as defined by the act and regulations is stringent; and

2.  The ALJ's decision was based on substantial evidence because it "supports the ALJ's decision that Plaintiff could perform a range of unskilled, light work and, thus, [Plaintiff] was not disabled."

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 13, at 5-6).

**C.      Analysis of the Administrative Law Judge's Decision**

**1.   The ALJ erred by "failing to find the claimant's sciatica to be a 'severe' impairment within the meaning of the regulations"[5]**

To determine whether a disability exists, the claimant bears the burden of proving that he or she suffers from a medically determinable impairment that is severe in nature. Farnsworth v. Astrue, 604 F. Supp. 2d 828, 851 (N.D.W. Va. 2009). When proving that he or she suffers from a medically determinable impairment, the claimant must show more than a "mere diagnosis of condition . . . . [I]nstead, there must be a showing of related functional loss." Pierce v. Colvin, No. 5:14CV37, 2015 WL 136651, at *16 (N.D.W. Va. Jan. 9, 2015) (internal citations omitted).

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including capacities for seeing, hearing and speaking and physical functions such as walking and standing. 20 C.F.R. § 404.1521(b).

Any impairment must result from abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1508.  Unless the impairment will result in death, it must have lasted or be expected to last for a continuous period of at least twelve months. 20 C.F.R. § 404.1509.  An impairment, however, can be considered "'not severe' only if it is a slight abnormality which has such a minimal effect on the individual

---

[5] One of Defendant's contentions in its Motion was that The ALJ decision was correct because disability as defined by the act and regulations is stringent. Defendant argued that "Plaintiff bears the burden of showing not only that he has a medically determinable physical or mental impairment but also that it is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy," and references Heckler v. Campbell, 461 U.S. 458 (1983). The undersigned finds no reason to rule on this because there is no question that the Plaintiff bears the burden and this contention contains no other argument.

that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Here, the Plaintiff alleges the ALJ committed reversible error by failing to find Plaintiff's sciatica a "severe impairment" within the meaning of 20 C.F.R. 404.1505(a). Pl.'s Br. 9-10. The Defendant counters by stating "the ALJ found Plaintiff's degenerative disc disease of the lumbar spine was severe at step two, and Plaintiff's degenerative disc disease impairment would subsume plaintiff's sciatica (pain originating in the lower back). Def.'s Br. 6. Yet, regardless of whether Plaintiff's degenerative disc disease would absorb—or by some measure cause—Plaintiff's sciatica, the true inquiry is whether the ALJ considered the sciatica's combined effect with all of the Plaintiff's impairments.

If an ALJ finds any severe impairment, an argument that she should have found more is "easily dispose[d] of," because:

> Once an ALJ has found that a claimant has at least one severe impairment, a failure to designate another disorder as "severe" at step two does not constitute reversible error because, under the regulations, the agency at later steps "consider[s] the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. 404.1523, 416.923; *see also id.*§§ 404.1525(e), 416.945(e);

Mauzy v. Astrue, 2010 WL 1369107, No. (N.D.W. Va. Mar. 30, 2010) (citing Brescia v. Astrue, 287 Fed. App'x 626 (10th Cir. 2008)). Here, the record reflects that the ALJ considered the pain in Plaintiff's back and along the sciatic nerve thoroughly before issuing her decision. (R. 27-32; R. 59-64). At the hearing, the ALJ asked the Plaintiff a variety of questions aimed at collecting Plaintiff's subjective determinations regarding his pain. (R. 59-64). The ALJ asked the Plaintiff "[C]an you describe what [the pain] feels like?" Id. at 59. The ALJ also asked questions specifically addressing: what causes the pain, how long the Plaintiff is able to sit or stand, and how the pain affects the Plaintiff's ability to perform household chores. Id. at 59-64.

Furthermore, the ALJ's written decision explicitly discusses Plaintiff's "lower back pain and sciatic nerve in the right hip." (R. 28). The ALJ states:

> At the hearing, the claimant testified that he is unable to work due to lower back pain, which radiates into his right leg and arm. He described his pain as sharp, throbbing, and constant. He testified that the front of his right leg is numb and that he cannot bend over, sit, or stand for any significant amount of time. He further testified that he has shooting pain down his right arm, which causes him coordination problems. Specifically, he testified that he has difficulties brushing his teeth and holding on to items with his right am1. Due to his condition, he testified that he is limited to lifting up to twenty-five pounds, is limited to walking up to one block, and is limited to sitting for twenty minutes. He also endorsed decreased concentration and sleep problems due to his pain.

Id. After discussing the credibility of Plaintiff's statements regarding his lower back pain, the ALJ stated:

> [t]he foregoing evidence does indicate the claimant to have impairments, which are likely to impose functional limitations. However, the undersigned concludes that these findings are not indicative of any intractable condition that would preclude the claimant from performing unskilled work activity at the light level for 12 consecutive months. Indeed, the claimant has a treatment history, which fails to demonstrate a condition of the degree of severity which the claimant has alleged. Further, the claimant's daily living activities are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations.

(R. 32). Accordingly, it was not error for the ALJ to find Plaintiff's sciatica non-severe, in and of itself, because the ALJ considered the combined effect of Plaintiff's designated severe impairments and non-severe sciatica (lower back pain).

### 2. The ALJ's erred because its credibility determination of Plaintiff is not supported by substantial evidence.

Plaintiff's main argument centers on the fact that the ALJ mischaracterized Plaintiff's ability to perform his daily activities and that his minimal daily activities are not representative of his ability to perform work activity. Further, this consideration is not inconsistent with an inability to perform full time, competitive work.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §

404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id.

Social Security Ruling 96–7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

1. The individual's daily activities; 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. Factors that precipitate and aggravate the symptoms; 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996).

The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011 WL 541125, at *3 (N.D.W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v.

46

Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D.W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

To meet the duty of explanation, a determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. However, in so doing, "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion." Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (internal citation omitted). Nor may the ALJ "simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Lewis v. Berryhill, No. 15-2473, 2017 WL 2381113 (4th Cir. June 2, 2017) (internal citation omitted). Rather, the ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level." Diaz, 55 F.3d at 307 (internal citation omitted).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."  Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). An ALJ's failure to do this "approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (quoting Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974)).

An ALJ may not cross "the line between considering the evidence of record and 'playing doctor' by drawing his own medical conclusions about [a plaintiff's] . . . impairments." Forquer

v. Commissioner of Social Security, No. 1:15CV57, 19 (N.D.W. Va. 2015) (citing Frank v. Barnhart, 326 F.3d 618, 621-22 (5th Cir. 2003)) (noting that ALJ impermissibly made his own independent medical assessments by drawing his own medical conclusions from medical evidence of record). Further, the evidence cited simply does not support the ALJ's conclusions. Not only does the ALJ's opinion lack an accurate and logical bridge from the evidence to her conclusions, it is difficult to discern so much as a logical footpath.

The ALJ made the following finding credibility determination regarding Plaintiff:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(R. 28).

The ALJ provided the following explanation regarding the credibility:

> The undersigned acknowledge[d] that the claimant has a consistent work history, the undersigned has also considered the claimant's daily living activities, and finds that such activities do not support the presence of debilitating functional limitations. Indeed, as discussed above, the claimant participates in fairly significant daily living activities, including caring for his teenage daughter, cooking basic meals, performing yard work, performing light household chores, using a riding lawn mower, shopping in stores, watching television, attending church, and getting outside every other day. Overall, the undersigned finds these activities consistent with the ability to perform unskilled light work.

Id.

The ALJ continued stating that the above considerations "detracted" from the credibility of Plaintiff's allegations about the severity of his symptoms. The ALJ reasoned that the while Plaintiff does have the impairment, which would likely impose some functional limitations, "these findings are not indicative of any intractable condition that would preclude the claimant from performing unskilled work activity at the light level for 12 consecutive mouths." (R. 32).

48

The ALJ further reasoned that Plaintiff's explanation of his daily activities were not consistent with what "one would expect, given his complaints of disabling symptoms and limitations." The ALJ explained the weight that is considered in reaching this determination, the ALJ accorded great weight based on the residual functional capacity assessment.

Beyond the infirmity, additionally, a claimant's daily activities are relevant evidence when assessing his alleged symptoms. See 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." Craft v. Astrue, 539 F.3d 668, (7th Cir. 2008) (quoting Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006). "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." Woods v. Berryhill, 888 F.3d 686 (4th Cir. 2018). In Woods, the court reviewed an ALJ's determination that a claimant's ability to maintain personal hygiene, cook, perform light household chores, shop, socialize with family members, and attend church services," were inconsistent with someone who was "alleging the pain, severity, and limitations as posed by the claimant." Id. at 694.

Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (Riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue). See also Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring for horses and dogs, riding horses and operating a tractor was conflicting evidence); Kearse v. Massanari, 73 Fed. App'x. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination).

49

Here, the ALJ focused on Plaintiff's abilities to perform daily activities, but did not consider the extent that those activities are performed and the successfulness of each of those activities. For instance, Plaintiff pays his daughter to help clean the house, do the dishes, and fix meals because he is unable to do so. (R. 61). He had to purchase a ride on lawn mower for his nephew to use to cut the grass. Id. Plaintiff testified that while he does go to church, he can only go if someone takes him because he cannot walk because it is too far. Id. His daughter does the grocery shopping and when he has to go he uses a ride-on buggy. Id.

The undersigned, after reviewing the ALJ's credibility determination, finds that the ALJ's consideration that a particular daily activity is initiated alone does not render her credibility determination to be based on substantial evidence. The ALJ should have considered how successful Plaintiff was at these activities and whether there were any changes in his abilities to complete these daily activities. In fact the ALJ explicitly considered that Plaintiff attempted those activities and made no mention of the fact Plaintiff could not do some of them anymore and actually had to hire other people to complete these daily activities. Until this has been considered, the undersigned does not consider the credibility to be based on substantial evidence and recommends that the District Court remand this portion of the case to the ALJ to consider whether Plaintiff's inability to complete these tasks affects the credibility determination.

3. **The ALJ erred by "erroneously rel[ying] on the assessment of the state agency consultant because the medical records following the consultation were considered by the ALJ.**

Plaintiff argues that "the ALJ assigned great weight to the physical residual functional capacity assessment performed by the States agency consultant . . . was clearly made in error [because] [m]ost of the medical evidence was not received until after the States's examination on January 24, 2014. Pf. Br., at 10. Plaintiff argues that because the state agency did not examine

the entirety of the medical records, the ALJ's determination was less reliable. Id. Regarding

weight given to medical opinions, generally, the opinions of examining sources are given greater

weight than the opinions of non-examining sources, and treating sources are given greater weight

than non-treating sources.  20 C.F.R. § 404.1527(c).  However, "an ALJ may assign little or no

weight to a medical opinion, even one from a treating source . . . if he sufficiently explains his

rationale and if the record supports his findings."  Wireman v. Barnhart, 2006 WL 2565245, at

*8 (W.D. Va. Sept. 5, 2006).

The ALJ described her reasoning for giving such great weight to the RFC:

> In reaching this decision, great weight is accorded to the physical residual
> functional capacity assessment prepared by the State agency consultant
> (Exhibit 3A). This expert found the claimant capable of light exertional work
> with some postural and environmental limitations (Exhibits 3A). This opinion
> is balanced, objective, and consistent with the evidence of record as a whole.
> Although the State agency consultant did not have an opportunity to examine
> or treat the claimant, the reports clearly reflects a thorough review of the
> record and is supportable. Such opinion is supported by physical
> examinations findings showing that the claimant retains good strength, a
> normal gait, and intact cranial nerves, as well as, his significant daily living
> activities. Nevertheless, the undersigned has included more restrictive
> postural limitations. This does not reflect any fallacy with the State agency
> consultant's reasoning, but rather is a function of according the claimant the
> utmost benefit of the doubt.

(R. 27).

After careful review of the record, the undersigned finds that the ALJ did not err in her

decision to assign great weight to the opinion of Dr. Lauderman, a non-examining source.  The

court finds that the ALJ provided a sufficiently explained rationale when assigning great weight

to Dr. Lauderman's medical opinion.  Specifically, the  ALJ stated "the opinion is balanced,

objective, and consistent with the evidence of record as a whole . . . [s]uch opinion is supported

by physical examinations showing that the claimant retains good strength, a normal gait, and

intact cranial nerves, as well as, his significant daily living activities." (R. 32).  Despite finding

51

ample evidence in the record to support the state consultant's RFC, the ALJ decided to include "more restrictive postural limitation" to afford the Plaintiff "the utmost benefit of the doubt." Id.

Additionally, the Plaintiff argues the ALJ should not have relied on Dr. Lauderman's Residual Functional Capacity ("RFC") assessment because Dr. Lauderman did not, and could not, rely on the totality of Plaintiff's medical records. The Defendant counters by stating that Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011), provides insight on affording weight to state agency review preceding the completion of the record. Indeed, the Defendant asserts the more relevant inquiry is:

> "[w]hether the consultant's opinion is entitled to weight rests on whether any significant change occurred in the claimant's condition after issuance of the consultant's opinion that reasonably would affect its validity." Hampton v. Colvin, No. 1:14- CV-24505, 2015 WL 5304294, at *22 (S.D.W. Va. Aug. 17, 2015) (citing Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011)), adopted by 2015 WL 5304292 (S.D.W Va. Sept. 9, 2015).

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") ECF No. 13, at 10). Thus, the only error on the ALJ's part would be if the medical records after the RFC's issuance demonstrated a significant change in Plaintiff's condition and the ALJ ignored such demonstration. The undersigned reviews this determination below.

In keeping with Chandler's principle, no significant change occurred in the Plaintiff's condition from the RFC's issuance (2014) to the ALJ's decision (2016). On February 21, 2014, Plaintiff underwent a Thoracic Spine MRI with and without Contrast, which showed "no definite areas of abnormal contrast enhancement could be seen. No evidence of large disc herniation, significant spinal canal stenosis or neural foramimal narrowing." (R. 488). An MRI of the Cervical Spine taken that same day demonstrated "Multilevel degenerative disc disease, notably at C5-C6 and C-6-C7 levels." (R. 491). This MRI yielded unremarkable results. (R. 568). An MRI of the Brain showed "Old lacunar infarct in the region of left caudate. No definite evidence

to suggest acute intracranial process." (R. 493). On June 1, 2014, Plaintiff underwent an MRI, which showed "stable two intradural small enhancing lesions since 12/5/2013, suggestive of neurogenic tumors." (R. 486). On July 1, 2014, Plaintiff underwent an MRI which found that there were "stable two intradural small enhancing lesions since 12/5/2013, suggestive of neurogenic tumors." (R. 468). On August 31, 2015, Plaintiff underwent a Diagnostic Study Report which indicated that "this right lower extremity EMG/NCS is normal. There is no electro diagnostic evidence of a lumbosacral radiculopathy or for another neuropathic process." (R. 561).

The ALJ's determination of whether the RFC's determination was reliable due to his mental conditions was adequately addressed throughout the ALJ's opinion. Plaintiff endured a horrific tragedy in 2015—the passing of his son—and later attempted suicide, there was no evidence that his anxiety or mental disorders showed limitations. The ALJ noted that "[Plaintiff's] mental examination findings and GAF scores show no more than mild to moderate mental symptoms and limitations." Id. Additionally, the ALJ noted that the record continually reflects that the Plaintiff "repeatedly [denies] suicidal ideation" and has "good eye contact, normal speech, intact memory and linear . . . goal directed though processes." Id. For instance, on July 23, 2015, the doctor noted Plaintiff was "negative for change in personality or mood, irritability, anger, social withdrawal, difficulties with interaction."

His son's death, however, lead to the doctors to believe that Plaintiff may be suffering from Post-traumatic Stress Disorder. The ALJ noted that he did not receive any pain management from July 2, 2014 until July 22, 2015 when he was incarcerated. While this is true, Plaintiff was prescribed Effexor for 90 days from January 30, 2015 until February 6, 2015, and February 5, 2015 to May 5, 2015. (R. 821). Plaintiff was also prescribed Venlafaxine from

February 13, 2015 until May 13, 2015. (R. 823). On September 3, 2015, the doctor noted

Plaintiff

> now depressed angry anxious panic attacks doesn't want to be around people.
> Doesn't care if he lives or dies but does denies suicidal or homicidal ideation. Did
> ask about his mood prior to his son dying. Reports he always had anger issues.
> Reports having mood changes. Highs and lows. His description appears he used to
> be hypornanic.

(R. 519).

On October 6, 2015, Plaintiff was admitted to the hospital following a suicide attempt.

Plaintiff was discharged on October 13, 2015 and assessed that he suffered from a major

depressive disorder, anxiety disorder, post-traumatic stress disorder, alcohol use disorder, and

anxiolytic use disorder. (R. 631). Meanwhile, the doctor's notes stated that Plaintiff stated that

his mood had improved and has discussed the negative role that alcohol played in his life. (R.

633). He mentioned his faith and how he is continually working on forgiveness and denied any

further thoughts to harm himself or others. Id. The ALJ appropriately considered the Plaintiff's

increased depressive symptoms and suicide attempt and still found a lack of "debilitating mental

limitations." (R. 32). There is evidence that Plaintiff's mental state deteriorated after the death of

his son. There is also evidence that Plaintiff's mental state did not support mental limitations and

this determination was adequately explained by the ALJ. In this situation, the undersigned cannot

reverse an ALJ's determination when there is substantial evidence that supports the ALJ's

determination and the ALJ properly weighed all the evidence and provided an explanation for

that determination.

There was still substantial evidence for the ALJ to accord great weight to Dr.

Laudermen's opinion. Therefore, no significant change to Plaintiff's condition has occurred, and

the ALJ appropriately relied on the non-examiner's medical opinion. Accordingly, the

undersigned determines that the ALJ's decision to assign great weight to the state agency consultant's medical opinion is appropriately and properly supported by substantial evidence in the medical record.

> ### 4. The determination of whether ALJ's finding that Plaintiff can perform light work is based on substantial evidence cannot be analyzed fully due to the insufficient credibility determination.

When assessing a claimant's RFC, the Social Security Ruling 96-8p, 61 Fed.Reg. 34,475 requires an ALJ to "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). Those functions "include physical abilities such as sitting, standing, walking, lifting, carrying, pushing, and pulling; mental abilities . . . and other abilities such as seeing, hearing, and the ability to tolerate environmental factors." Cichocki v. Astrue, 729 F.3d 172,176 (2d Cir. 2013) (citing 20 C.F.R. §§404.1545, 416.945). Only after the function-by-function analysis has been completed that RFC "may be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Mascio, 780 F.3d at 636 (quoting SSR 96-8p, 61 Fed.Reg. at 34,475). The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Mascio, 780 F.3d at 636 (citation omitted). A discussion of the functional limitations in broad terms followed by an in-depth analysis supporting the ALJ's function findings will satisfy the regulations requirement as well. See Ashby v. Colvin, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015).

Plaintiff argues that "the evidence of record clearly and continuously suggests that Plaintiff's back pain, sciatica, and leg numbness all limit him to such a degree that he could not

sustain light work" and that the ALJ "grossly underestimated the severity and RFC impact of his

mental impairments."

In this case, the ALJ found that Plaintiff has the RFC to perform light work of a limited

range that included exertional, postural, and environmental limitation. (R. 27). To be considered

able to perform light work of a limited range, the following regulation applies:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds. Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls. To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567 (b).

The Plaintiff alleged disability due to lower back pain and sciatic nerve in the right hip

causing difficulties with "lifting, squatting, bending, standing, walking, sitting, kneeling, stair

climbing, and getting along with others." Id. at 28.  The ALJ found that Plaintiff's medically

determinable impairments "could reasonably be expected to cause the alleged symptoms;

however, the claimant's statements concerning the intensity, persistence, and limiting effects of

these symptoms are not entirely credible for the reasons explained in this decision." Id.  In other

words, the ALJ's decision demonstrates that the ALJ believed Plaintiff was experiencing lower

back pain  as a result of one or more medically determinable impairments, but did not credit

Plaintiff's assertion that he was limited to sitting for twenty minutes, walking more than one

block (without a break), and standing for a short time period.

The ALJ provided a substantive discussion of her rationale.  First, the ALJ discussed the

record's support of the Plaintiff's physical impairments. The ALJ stated:

> [W]hile the record supports diagnoses of degenerative disc disease of the lumbar and cervical spine and a history of cerebrovascular accident, the objective studies, physical examinations findings, and the claimant's treatment history reflect that such impairments do not preclude the claimant the ability to perform a range of light exertional work activities.

(R. 28). The ALJ went on to describe how multiple x-rays of the Plaintiff's spine, dating from July, 2013, to January, 2014, showed "mild to moderate" facet arthrosis and "mild disc space narrowing. Id. Further, the ALJ noted the results of Plaintiff's multiple lumbar MRIs as showing "mild to moderate degenerative dis disease," the presence of lesions,[6] "tiny intradural enhancing nodule . . . appearing grossly stable," and "unchanged mild to moderate bilateral neural foraminal narrowing, without central canal stenosis." Id.

The ALJ was also sure to consider the results of Plaintiff's cervical spine MRI and thoracic spine MRI performed in February, 2014. (R. 29). The ALJ considered that Plaintiff's cervical spine MRI revealed:

> degenerative changes with marginal osteophyte formation and diminished height and hydration signal of the discs, uncovertebral hypertrophy and facet joint degenerative changes with moderate to severe bilateral neural foraminal nan-owing at C5-C6, and uncovertebral hypertrophy and facet joint degenerative changes with at least moderate bilateral neural foramina nan-owing at C6-C7, but no evidence of intradural masses or lesions, no definite abnormal signal intensities within the visualized spinal cord, and unremarkable craniocervical junction.

Id. Further, the ALJ considered that Plaintiff's thoracic spine MRI revealed:

> degenerative changes with marginal osteophyte formation and diminished height and hydration signal of the discs, minimal disc bulges at T6-T7 and T7-T8, but no definite areas of abnormal contrast, and no evidence of large disc herniation, significant spinal canal stenosis, or neural foraminal narrowing.

---

[6] The January, 2014, lumbar MRI characterized the lesions as "enhancing lesions in the lumbar spinal canal," while a second lumbar MRI taken in July, 2014, characterized the lesions as "stable benign." (R. 29) Further, a third lumbar MRI—taken in September, 2015—characterized the lesions as "two stable small lesions." Id. Finally, the ALJ noted  when the lesions were first discovered in the January, 2014, lumbar MRI, neurosurgery reviewed the Plaintiff's MRI and determined the results were "unremarkable." Id.

Id. After considering these objective findings, the ALJ explained why she failed to find "the presence of debilitating systems." Id. Despite finding that physical examinations "often assessed [the Plaintiff] with tenderness and a decreased range of motion in the lumbar spine with a positive straight leg rise on the right," the ALJ also found that physical examinations regularly assessed the Plaintiff's symptoms as less severe than alleged. Id. The ALJ stated:

> [The Plaintiff] is regularly assessed with intact cranial nerves, 5/5 strength in his extremities with no edema, and a negative Romberg. Moreover, he is regularly assessed with a normal neck and cervical spine examination, showing full range of motion and no tenderness."

Id. The ALJ further supported her function findings by considering the Plaintiff's treatment for back pain. The ALJ stated, "[i]ndeed, his treatment has been limited to a few pain injections, a few physical therapy sessions, and medication management." (R. 29-30). Furthermore, the ALJ noted that surgery has not been considered, and that the Plaintiff has received no more pain medications since being released from prison.[7]

The ALJ considered the results of Plaintiff's February, 2013, brain MRI[8] which showed:

> multiple areas of abnormal signal in the left cerebral hemisphere in the middle cerebral artery distribution, as well as, a larger area of abnormal signal in the head and body of the left caudate nucleus, and anterior limitations of the left internal capsule and anterior aspect of the left basal ganglia, consistent with acute or recent ischemic changes and "mild" cerebral atrophy. A CT of the claimant's head performed at the same time, showed no acute intracranial findings. While the hospitalization records are not included, the claimant reported that he was treated in the hospital for a week in February 2013, due to a cerebrovascular accident. Nevertheless, subsequently, the claimant was placed on Simvastatin and his condition improved.

Id. The ALJ also considered the results of an MRI from February, 2014, showing "an old lacunar infarct in the left caudate." A holter monitor test, an echocardiogram, and a stress test[9]—all

---

[7] It should be noted that the Plaintiff was prescribed gabapentin at the time of the ALJ's decision, but Plaintiff expressed, at the oral hearing, that he quit taking gabapentin because "it made me delusional." (R. 64).
[8] Plaintiff's brain MRI was prompted from evidence that Plaintiff experienced a cerebrovascular accident prior to the alleged onset date. (R. 30).

performed in 2014—yielded normal results. Accordingly, the ALJ found that the evidence did not support the presence of debilitating symptoms and limitations from the Plaintiff's cerebrovascular accident.

The Plaintiff argues that "the ALJ grossly underestimated the severity and RFC impact of his mental impairments." (Pl.'s Br. 12). However, the ALJ's written decision makes it clear that Plaintiff's mental impairments, including the potential effect of Plaintiff's suicide attempt and bereavement from his son's passing, were substantially considered. The ALJ further supported her functional findings by considering the totality of Plaintiff's mental impairments. (R. 31). Here, the ALJ noted the Plaintiff had a history of "major depressive disorder, anxiety disorder, PTSD, bereavement, alcohol use disorder, and anxiolytic use disorder." Id. The ALJ even goes as far to admit the record supports the Plaintiff's depression and anxiety "understandably worsened after the [Plaintiff's] infant son died of drowning." Id. Again, the ALJ considered the Plaintiff's subsequent suicide attempt, but determined his mental examinations were not consistent with the presence of disabling mental symptoms[10]. Id. Furthermore, the ALJ considered the Plaintiff's self-admitted history of binge drinking alcohol and Xanax abuse. Id. However, the ALJ concluded that there was no evidence "of any illicit drug or alcohol use or abuse" after Plaintiff's attempted suicide in October, 2015.[11] (R. 33). However, part of the of the ALJ's determination in this consideration was the reliability of Plaintiff's statements regarding

---

[9] Plaintiff's stress test was negative for exercise induced ischemic EKG changes, with no clinical exercise induced symptoms, showing a good aerobic work capacity at a moderate work load, no significant reversible defect, normal wall motion and perfusion with an ejection fraction of 66%, and a lung/heart ratio within normal limits. (R. 30).

[10] The ALJ stated:

> Specifically, while the claimant is occasionally assessed with a depressed mood and a flat affect, he is, nonetheless, regularly assessed as alert, fully orientated, cooperative, with good grooming, good eye contact, normal speech, intact memory, and linear and goal directed thought processes.

[11] The ALJ noted that Plaintiff testified he is "currently attending AA meetings, seeing his psychologist once a month, and that he is responding well to his prescribed medications." (R. 30).

his abilities to complete tasks. This credibility determination, as discussed above, was not based on substantial evidence. As a result, because this determination is partly assessed using Plaintiffs allegations concerning his own impairment, whether this was based on substantial evidence cannot be fully evaluated until the ALJ properly considers all factors of the credibility.

## 3.  <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Deputy Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that

Plaintiff's Motion for Summary Judgment (ECF No. 11) be **GRANTED IN PART**, and Defendant's Motion for Summary Judgment (ECF No. 12) be **DENIED**, and the decision of the Deputy Commissioner be vacated and this case be **REMANDED** pursuant to further proceedings.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this July 31, 2018

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE